Laura B. Kalur, OSB No. 023424
Kalur Law Office, P.C.
11575 SW Pacific Hwy., Suite 142
Tigard, OR 97223
(971) 727-3959
(971) 727-3942 – Facsimile
lkalur@kalurlaw.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
### Portland Division

**DEBORAH J. SMITH, Individually**
**and as Administrator of the ESTATE**
**OF STEPHEN M. SMITH,**                          **Case No.**

    **Plaintiff,**

**v.**                                            **COMPLAINT**

**UNITED STATES OF AMERICA,**

    **Defendant.**

Plaintiff Deborah J. Smith, Individually and as Administrator of the Estate of Stephen

M. Smith ("Mrs. Smith"), by counsel, states her cause of action against Defendant United States

of America as set forth below:

### Jurisdiction and Venue

1.    This action arises under the Federal Tort Claims Act of 1948, 62 Stat. 982,

28 U.S.C. §§ 1346(b) and 2671, et seq.

2.    This Court is vested with jurisdiction to adjudicate this dispute pursuant to

28 U.S.C. § 1346(b).

3.      In compliance with 28 U.S.C. § 2675, Mrs. Smith filed her notice of administrative claim with the appropriate administrative agency—the Department of Veterans Affairs (the "VA")—on November 25, 2016.

4.      On August 16, 2017, the VA Office of General Counsel, Torts Law Group in Seattle, Washington, denied Mrs. Smith's administrative tort claim.

5.      Accordingly, Mrs. Smith's claim is ripe to be litigated in this Court pursuant to 28 U.S.C. § 2675(a).

6.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1402(b) because the injury complained of occurred at the VA Medical Center located in Portland, Oregon ("Portland VAMC"), and thus, the cause of action arose within the District of the State of Oregon.

## General Allegations

7.      At all times relevant to this action, Ms. Smith resided within the State of Oregon.

8.      At all times relevant to this action, Defendant owned and operated the Roseburg, Portland, and Seattle VAMCs.

9.      At all times mentioned herein, the agents, servants, and employees of Defendant were acting within the course and scope of their agency.

10.     On June 20, 2008, decedent Stephen M. Smith ("Mr. Smith") underwent bilateral knee arthroscopy at the Portland VAMC.

COMPLAINT - 2

11.     At that time, VA oncologist Ann Gramza, M.D., noted that in the "past year," Mr. Smith had experienced a fall in his white blood cell count ("WBC"), from 4.3 to 2.9. No steps were taken to further evaluate this concerning development.

12.     On March 3, 2009, Mr. Smith's total WBC was documented as 2.4.

13.     A primary care provider at Roseburg VAMC, Michael Bisgrove, M.D. ("Dr. Bisgrove"), documented on March 8, 2009, that these were "very unusual" lab results and recommended a check on Mr. Smith's status.

14.     On March 9, 2009, Mr. Smith was seen by Raylene Coleman, ANP ("Ms. Coleman"), at the Portland VAMC for a pre-anesthetic evaluation prior to a planned orthopedic surgery.

15.     Ms. Coleman noted that Mr. Smith's lab results revealed leukopenia/neutropenia and contacted the hematology clinic to discuss this finding.  She spoke with Dr. Ciszewski, who "recommended that patient be seen in their clinic ASAP." Ms. Coleman postponed the planned surgery to allow for Mr. Smith to be evaluated first by hematology.  The hematology evaluation was scheduled for March 12, 2009.

16.     On March 12, 2009, Mr. Smith was seen by Angela Fleischman, M.D., Ph.D. ("Dr. Fleischman"), in the Portland VAMC hematology and oncology clinic.  A bone marrow biopsy was performed by Dr. Fleischman at this appointment.

17.     Mr. Smith's bone marrow specimen was evaluated at the Portland VAMC and was sent to Oregon Health & Science University ("OHSU") for further consultation and cytogenetic analysis.

18.     On March 18, 2009, Dr. Fleischman documented that she had reviewed the bone marrow biopsy results and discussed them with her supervising practitioner, Dr. Chris Ryan. Dr. Fleischman noted that the results included mild dysplasia, which could "possibly represent MDS" (myelodysplastic syndrome), as well as significantly decreased iron stores requiring supplementation. Dr. Fleischman noted that Mr. Smith should be seen in follow-up in the hematology and oncology clinic every six months for his "possible MDS."

19.     Mr. Smith underwent right knee arthroscopy and chondroplasty, and left knee chondroplasty on April 2, 2009 at the Portland VAMC.

20.     On October 8, 2009, Mr. Smith was again evaluated by Dr. Fleischman for a hematology/oncology follow-up at the Portland VAMC. Dr. Fleischman noted that Mr. Smith was exhibiting continued leukopenia and thrombocytopenia, and that his "ANC (absolute neutrophil count) is quite low and has been for some time…" In addition, Dr. Fleischman stated that the March 2009 bone marrow biopsy had shown "possible early MDS vs. toxic insult to marrow." Another follow-up visit was scheduled for the following month.

21.     Dr. Fleischman noted that she discussed Mr. Smith with her supervising practitioner, Dr. Craig Okada, who agreed with her assessment and plan.

22.    Mr. Smith returned to the Portland VAMC on November 24, 2009 where he was again evaluated by Dr. Fleischman in hematology/oncology.  At this visit, his WBC was noted to be 2.4 and he was found to have a chronic ulcer on his tongue.  Dr. Fleischman noted in her assessment and plan:  "Pancytopenia.  Counts appear to be somewhat stable. Will continue to monitor."  Dr. Okada again approved of Dr. Fleischman's plan.

23.    Oral mucosal ulcers are a common symptom in neutropenia. This symptom was consistent with the issues Mr. Smith was having with his white blood cell count.

24.    Mr.  Smith  was  again  evaluated  by  Dr.  Fleischman  in  the hematology/oncology clinic on December 4, 2009 and March 5, 2010.  During both visits, he complained of tongue lesions.

25.     In the medical record generated on March 5, 2010, Dr. Fleischman noted that Mr. Smith's counts would continue to be monitored and that a repeat bone marrow biopsy would be discussed to see if a definitive diagnosis of MDS could be made.

26.    On June 23, 2010, Mr. Smith was seen by Dr. Bisgrove at the Roseburg VAMC, at which time he complained of enlarged lymph nodes in his neck and fatigue.  Dr. Bisgrove noted that Mr. Smith continued to experience "lingual margin ulcers."  On examination, Dr. Bisgrove found no palpable adenopathy, although he described the patient as "very tender through the right lateral neck…"

27.    Mr. Smith underwent a second bone marrow biopsy on August 6, 2010 at the Portland VAMC.  Analysis and specialized testing of the biopsy specimens at the Portland VAMC and at OHSU found "mild myeloid dyspoiesis, possibly early MDS."

28.     On December 9, 2010, Mr. Smith was again evaluated by Dr. Fleischman, who noted that his "counts" were low, that he remained neutropenic and thrombocytopenic, and that he had experienced recent nosebleeds.   Dr. Okada again approved of her assessment and plan.

29.     Mr. Smith remained neutropenic and thrombocytopenic when next seen by Dr. Fleischman in the hematology/oncology clinic on March 10, 2011.  Dr. Fleischman documented a discussion with Mr. Smith regarding potential treatment for MDS, including azacitidine and stem cell transplant, and the possibility of "transformation to AML" (acute myeloid leukemia).

30.     Dr. Fleischman additionally noted that Mr. Smith was "not interested in therapy at this time, as he is clinically unaffected by his cytopenias."    No documentation that Dr. Fleischman discussed the risks and benefits of treatment with Mr. Smith, or that she discussed the risks of not treating MDS, is present in the medical record from this visit.

31.     Mr. Smith was admitted to the Roseburg VAMC from April 15-19, 2011, and treated for pneumonia mycoplasma.

32.     Mr. Smith was again admitted to the Roseburg VAMC from August 2-15, 2011 for neutropenic fevers related to his MDS.  During this admission it was noted that in addition to fever, Mr. Smith had also recently experienced an unintentional 40-pound weight loss.  Discharge diagnoses included myelodysplastic syndrome, thrombocytopenia, and neutropenic fever.

33.     On August 17, 2011, Mr. Smith was hospitalized at the Portland VAMC for continued fevers, diarrhea, and pancytopenia – a deficiency of all white blood cells, red blood cells, and platelets.  Healthcare providers noted a significant weight loss of forty pounds and a dramatic drop in his platelet count to 14,000.  Mr. Smith's WBC was 3.9 and hemoglobin was 1.1.  He was experiencing a low-grade infection.

34.     On August 19, 2011, while still hospitalized at the Portland VAMC, Mr. Smith underwent another bone marrow biopsy.  The biopsy revealed chromosomal abnormalities.   Mr. Smith's karyotype showed a deletion of chromosome 18.  Chromosomal deletions constitute substantial evidence for MDS with associated progressive pancytopenia.  There was no evidence of transformation to leukemia.

35.     During this inpatient admission, Mr. Smith was treated with antibiotics, although no definitive source of infection was found, as well as bone marrow stimulating medications.  He was discharged on August 28, 2011.

36.     On September 1, 2011, Mr. Smith was again evaluated at the Portland VAMC by Dr. Fleischman.  Dr. Fleischman documented that she and the patient "had a frank discussion" regarding the prognosis and therapy for MDS.  Dr. Fleischman noted that she had explained to Mr. Smith that the only option for long-term survival would be an allogeneic stem cell transplant, noting that Mr. Smith "understands the need for extensive time in Seattle and the mortality risks involved."

37.     On September 29, 2011, Mr. Smith was again evaluated by Dr. Fleischman at the Portland VAMC.  Regarding their conversation during this visit, Dr. Fleischman

noted that Mr. Smith would "like to continue to follow his trend and weigh his treatment options." Any additional discussion that occurred between Dr. Fleischman and Mr. Smith regarding his treatment options or the need for a stem cell transplant was not documented in the medical records.

38.     On October 4, 2011, Mr. Smith presented to the Portland VAMC with fever, enlarged lymph nodes and splenomegaly.

39.     Mr. Smith was admitted to the Portland VAMC on October 4, 2011. Dr. Fleischman elected to stimulate his white blood cell count and used Sargramostim to do so.

40.     Mr. Smith was discharged from the Portland VAMC on October 12, 2011.

41.     On January 27, 2012, Mr. Smith had a CT scan at the Portland VAMC ordered by Dr. Fleischman. Mr. Smith's spleen was measured 14.5 cm, while a normal spleen measures 11-12 cm.

42.     These findings were consistent with immunodeficiency and progressive MDS.

43.     No significant follow-up was performed or ordered despite these abnormalities.

44.     On July 19, 2012, Dr. Fleischman again evaluated Mr. Smith at the Portland VAMC. During this visit, Mr. Smith showed blood cell counts consistent with persistent pancytopenia. He additionally reported blood in his stool. Dr. Fleischman noted that an

additional complication Mr. Smith had been experiencing was candida esophagitis, a yeast infection of the esophagus.

45.     On August 23, 2012, Mr. Smith was seen at the Portland VAMC by Dr. Fleischman, at which time he complained of a cough and low-grade fevers for the "past few weeks."  Dr. Fleischman ordered a CT scan, which was performed this same day and notable for "waxing and waning pulmonary opacities favored to represent an infectious or inflammatory etiology."

46.     Mr. Smith's complaints and the CT findings on August 23, 2012, make it clear that a chronic, low grade infection was present in his lungs.

47.     Mr. Smith's condition continued to worsen and he was admitted to Columbia Memorial Hospital on September 2, 2012, with complaints including fever and coughing. His temperature in the emergency department was measured at 104.5 degrees; sepsis was suspected.  Later in the day on September 2, 2012, Mr. Smith was transferred to OHSU via Life Flight for further evaluation and treatment.

48.     Mr. Smith was treated for suspected pneumonia and micro-aspiration at OHSU and discharged home on September 3, 2012.

49.     On September 13, 2012, Mr. Smith was again evaluated at the Portland VAMC.  Mr. Smith's white blood cell count was 2.6 and platelets were 25,000.  This platelet level was abnormal and posed a significant risk of spontaneous bleeding.

50.    Mr. Smith had another bone marrow biopsy at the Portland VAMC on January 16, 2013, with results similar to those of prior biopsies, and no evidence of transformation to leukemia.

51.    On March 14, 2013, Dr. Fleischman evaluated Mr. Smith at the Portland VAMC and discussed the possibility of a stem cell transplant with him.  No work up for the stem cell transplant was begun at this juncture, although the patient expressed interest.

52.    Mr. Smith was again admitted to the Portland VAMC on April 3-5, 2013, to receive treatment for aspiration pneumonia and esophagitis.

53.    Dr. Fleischman again evaluated Mr. Smith at the Portland VAMC on April 11, 2013.  She noted that Mr. Smith's red blood cell distribution width was very high at 20.1%, indicating a greater variation in the size of his red blood cells, which was consistent with increasingly abnormal red blood cell production.  The content of her note regarding the stem cell transplant was identical to the March 14, 2013 note.

54.    On April 25, 2013, Dr. Fleischman again evaluated Mr. Smith at the Portland VAMC.  Dr. Fleischman noted that the patient authorized her to contact Thomas R. Chauncey, M.D., Ph.D. ("Dr. Chauncey") at the Seattle VAMC regarding transplant evaluation.

55.    On May 23, 2013, Mr. Smith was again evaluated by Dr. Fleischman at the Portland VAMC.   Dr. Fleischman's note from this date indicates that Dr. Chauncey suggested proceeding with a "psychological evaluation" to "confirm that the patient is appropriate for transplant from this standpoint first."

56.     Mr. Smith again returned to the Portland VAMC on June 13, 2013, where he was evaluated by Dr. Fleischman for a hematology/oncology follow-up visit.    The assessment and plan portion of Dr. Fleischman's progress note documenting this visit was identical to that of the May 23, 2013 visit.

57.     On June 19, 2013, Mr. Smith discussed the bone marrow transplant program with Joyce Willison, LCSW ("Ms. Willison") during a phone call.    During the call, Mr. Smith asked about using Medicare to have the bone marrow transplant at OHSU.    Ms. Willison explained that he would have copayments and no housing or transportation resources provided if he pursued the transplant using Medicare.    She noted that Mr. Smith hoped to use the Seattle VAMC bone marrow transplant unit and that she would schedule him around other appointments he would have for the bone marrow transplant work up.

58.     On July 2, 2013, Ms. Willison documented that she spoke to oncology about Mr. Smith.    She noted that the Seattle VAMC bone marrow transplant unit would like the social work and mental health evaluations done prior to further work up for the bone marrow transplant.

59.     David Mansoor, M.D. ("Dr. Mansoor") performed the pre-transplant mental health evaluation for Mr. Smith on July 24, 2013.    Dr. Mansoor documented, "[Mr. Smith] provided a history that was without concern regarding the transplant process in terms of his current psychiatric symptoms and access to adequate social support."

60.    Dr. Mansoor expressed some concern regarding Mr. Smith's past history of drug abuse, but otherwise expressed no reservations regarding Mr. Smith's suitability for transplantation.

61.    On September 9, 2013, Mr. Smith reported to the Emergency Department of Columbia Memorial Hospital with complaints of right knee and left ankle pain, swelling, and redness.  Healthcare providers documented that Mr. Smith's platelets were 4000 and his white blood cell count was 7.2.

62.    Mr. Smith was admitted to Columbia Memorial Hospital and was ultimately diagnosed with another infection – this time cellulitis – for which he received antibiotics. Mr. Smith also required a platelet transfusion during this admission.  He was discharged home on September 13, 2013.

63.    Mr. Smith was admitted to the Portland VAMC from September 19-22, 2013, and treated for fatigue and "functional neutropenia."

64.    While an inpatient, on September 20, 2013, Mr. Smith was seen and evaluated by Ms. Willison for a "social work assessment for transplant candidates."

65.    Ms. Willison noted that she was encouraged by Mr. Smith's interest in pursuing a bone marrow transplant.  They discussed the need for a second caregiver for the transplant period.

66.    Through September, October, and November of 2013, Ms. Willison documented additional contact with Mr. Smith as they discussed appropriate back-up caregivers for him following his receipt of the transplant.  Ms. Willison and Mr. Smith

concluded that Ms. Smith would act as the primary caregiver, with a friend of Mr. Smith's identified as a back-up caregiver.

67.    On November 6, 2013, Mr. Smith was seen in the hematology/oncology Clinic at the Portland VAMC by Sharl S. Azar, M.D. ("Dr. Azar").  Dr. Azar noted that he had discussed Mr. Smith's case with Bonnie Anderson, the transplant coordinator, and that it was time to initiate the "medical evaluation at this time with labs, ECG, and CXR."

68.    Dr. Azar further noted that Mr. Smith would be receiving "numerous phone calls within the next few days to weeks to acquire this work up..."

69.    On December 3, 2013, Mr. Smith was seen for a dental consultation at the Portland VAMC for a pre-transplant evaluation.  He was seen by Octavia Erin Swanson ("Dr. Swanson"), a resident in the dental clinic.  Dr. Swanson noted that Mr. Smith was "cleared for transplant" after extraction of several teeth.

70.    On December 4, 2013, Mr. Smith underwent a MUGA scan (a cardiac study) at the Portland VAMC as part of the transplant evaluation process.  The study was normal.

71.    Mr. Smith was again hospitalized at the Portland VAMC from December 17-20, 2013, during which time he was treated for pneumonia.  It was noted at the time of admission that Mr. Smith had been experiencing fevers up to 104° Fahrenheit for one week.

72.    Dr. Azar saw Mr. Smith during this inpatient admission and noted on December 19, 2013, that they were still "awaiting transplant."

73.     Mr. Smith was seen in the emergency department at the Roseburg VAMC on February 24, 2014 and March 4, 2014.  Providers documented in the notes for both visits that Mr. Smith was awaiting bone marrow transplant.

74.     Mr. Smith was scheduled to see Dr. Azar in the hematology/oncology clinic of the Portland VAMC on March 6, 2014, but had to cancel the appointment due to car trouble.  Dr. Azar nevertheless entered a progress note in Mr. Smith's chart which stated, in part:  "While there was initially intent to proceed with a peripheral blood stem cell transplant, the patient has had a difficult time with the extensive evaluation that occurs prior to consideration for transplant.  He has had to miss appointments and cancel evaluations which has made the transplant work up quite difficult.  At this point, given what a significant impact the patient's diminished bone marrow activity has had on his quality of life including giving rise to multiple infections that have led to frequent hospitalizations, we will place a hold on any additional evaluation for a stem cell transplant…"

75.     It is unclear what appointments and evaluations Dr. Azar was referring to when authoring this note.

76.     On March 25, 2014, Mr. Smith was seen by dental resident Eric N. Alston to extract teeth prior to his transplant.  Five of Mr. Smith's teeth were extracted.

77.     Dr. Azar again evaluated Mr. Smith at the Portland VAMC on April 9, 2014. During this visit, Dr. Azar discussed treatment of his MDS with azacitidine, including that

the medication is administered daily for five days every four weeks.  Mr. Smith agreed to report to the Portland VAMC for the daily azacitidine treatments.

78.    Mr. Smith's first cycle of azacitidine was scheduled for July 7-11, 2014, after he had completed some dental work.

79.    Mr. Smith's course of azacitidine did not begin as planned as he required inpatient hospitalization at the Roseburg VAMC from July 2-6, 2014.  During that period, he was treated for another infection.

80.    Mr. Smith remained ill and was hospitalized again at the Roseburg VAMC from July 27-31, 2014.  He was treated for neutropenic fever, thrombocytopenia, and MDS, again requiring platelet transfusions.

81.    Mr. Smith began his first five-day cycle of chemotherapy with azacitidine on August 11, 2014 at the Portland VAMC.

82.    Mr. Smith's second cycle of chemotherapy was delayed as he was admitted to the Portland VAMC from September 13-17, 2014 and treated for cellulitis.

83.    Mr. Smith received his second cycle of chemotherapy on September 18, 19 and 22, 2014, and his third cycle on October 14-17, 2014.

84.    On October 30, 2014, Mr. Smith was evaluated in hematology/oncology by Dr. Azar at the Portland VAMC.  Dr. Azar noted that Mr. Smith had experienced "marked improvement in his cell counts" and ordered an additional three cycles of chemotherapy.

85.    Mr. Smith was hospitalized at Sutter Coast Hospital from November 3-5, 2014, where he was again treated for pneumonia.

86.     Mr. Smith was re-admitted to Sutter Coast Hospital from November 17-19, 2014 and treated for right-sided pneumonia with empyema and sepsis.  He was transferred by medical flight to Rogue Regional Medical Center for further treatment.

87.     Mr. Smith remained hospitalized at Rogue Regional Medical Center until December 12, 2014.  During the hospitalization, he was treated for pneumonia, empyema, severe thrombocytopenia, and anemia.

88.     On January 16, 2015, Mr. Smith reported to the Roseburg VAMC for treatment.  Providers documented that his WBC had risen to 180.4, his hemoglobin had dropped to 7.1, and his platelets were at 17,000.

89.     At this juncture, Mr. Smith was experiencing hyperleukocytosis, a potentially life-threatening condition.

90.     On January 22, 2015, Mr. Smith was evaluated by Dr. Azar in the hematology/oncology clinic at the Portland VAMC.  His WBC remained elevated at 154.6 and his platelets and hemoglobin remained diminished.

91.     Dr. Azar documented that he was highly suspicious that the 21% metamyelocytes of Mr. Smith's differential represented either transformation to acute leukemia or progression of his MDS.

92.     Dr. Azar admitted Mr. Smith to the Portland VAMC directly from the clinic.

93.     Dr. Azar documented that he discussed the following with Mr. Smith: that should his disease have progressed to AML, the disease would be high risk and ultimately

"he will require chemotherapy in house followed likely by a bone marrow transplant following consolidation."

94.     Dr. Azar noted that given Mr. Smith's young age and otherwise good state of health, he would be a "good candidate for aggressive treatment with the aim to cure his disease."

95.     Once admitted to the hospital on January 22, 2015, Mr. Smith had a CT scan which revealed "massive splenomegaly" as well as splenic infarct – tissue death due to loss of blood supply/oxygen.

96.     On the date of admission, January 22, 2015, Mr. Smith had another bone marrow biopsy, which showed an increase of blast cells to ~10%.

97.     On February 3, 2015, Mr. Smith began a 5-day cycle of azacitidine.

98.     On February 4, 2015, while still an inpatient, Mr. Smith was evaluated by Dr. Azar.  Dr. Azar documented that Mr. Smith's only chance at cure and long-term survival was a peripheral blood stem cell transplant.

99.     Dr. Azar noted that he discussed the need for transplant with Mr. Smith that day and that providers would work on the preparation for transplant after his discharge home from the inpatient stay.

100.    Mr. Smith also received radiation to his spleen at OHSU on a number of occasions during this hospitalization at the Portland VAMC.

101.    Mr. Smith was discharged home on February 17, 2015.

102.   On this same day, Ms. Willison authored an oncology social work follow-up note that indicated that Mr. Smith "was being reconsidered for bone marrow transplant."

103.   Mr. Smith received additional radiation treatments at OHSU following his discharge from the Portland VAMC.

104.   Mr. Smith began another cycle of chemotherapy on March 2, 2015.

105.   During March of 2015, Mr. Smith began receiving regular blood transfusions and his care continued to be managed by the hematology/oncology clinic at the Portland VAMC, primarily Dr. Azar.

106.   On March 20, 2015, Mr. Smith was seen and evaluated by Ms. Willison for a "social work assessment for transplant candidates."  She again discussed information about a proposed bone marrow transplant at the Seattle VAMC.  Ms. Willison noted that she was "impressed at their commitment and motivation to get Vet through [bone marrow transplant]."

107.   On April 6, 2015, Mr. Smith began his seventh cycle of chemotherapy.

108.   On April 9, 2015, Dr. Azar again evaluated Mr. Smith at the Portland VAMC. Dr. Azar documented that the VA had begun their evaluation for Mr. Smith's stem cell transplant and that he would meet with Dr. Chauncey at the Seattle VAMC in May.

109.   On May 4, 2015, Mr. Smith began his eighth cycle of chemotherapy.

110.   On May 8, 2015, Portland, Dr. Azar talked with Mr. Smith in the chemotherapy suite at the Portland VAMC.

111.    In his note regarding this discussion, Dr. Azar documented that Mr. Smith's WBC was 130 and that blasts were present in Mr. Smith's blood.

112.    Dr. Azar noted that this was suggestive that Mr. Smith's MDS was not responding to the azacitidine treatment.

113.    Dr. Azar noted that Mr. Smith was not scheduled to meet with Dr. Chauncey until the first week of June.  He additionally documented that Mr. Smith would receive human leukocyte antigen ("HLA") typing for his stem cell transplant, and that this was contingent on the initial visit.

114.    Dr. Azar documented that he would discuss acquiring decitabine, a chemotherapy medication not on the VAMC formulary, with the VA pharmacist.

115.    There is no indication in the medical records that this discussion between Dr. Azar and the VA pharmacist occurred.

116.    Portland VAMC providers did not provide additional treatment to Mr. Smith with decitabine, which could have been used to treat his MDS.

117.    On June 5, 2015, Bonnie J. Anderson, RN, BSN, OCN ("Ms. Anderson") spoke with Mrs. Smith on the telephone and documented their conversation in the medical records.  Ms. Anderson confirmed that Mr. Smith would report to the Seattle VAMC on June 9, 2015 for his stem cell transplant consultation.

118.    Mrs. Smith reported that Mr. Smith's weight was down to 100 pounds, and that she wished to seek a second opinion from a different oncologist.

COMPLAINT - 19

119.    Dr. Azar returned the call and spoke with Mrs. Smith.  He documented that he voiced his concern regarding her desire to cancel all of Mr. Smith's VAMC appointments "because of how long we have been waiting for him to proceed to transplant."

120.    Dr. Azar "emphasized that transplant is our only option to offer him long term longevity and that without it, [Mr. Smith] would likely pass away in one year or less, numbers that I have emphasized to them both before."

121.    Dr. Azar documented his awareness that Mr. Smith would die without a stem cell transplant and acknowledged that Mr. Smith had been waiting for the transplant for an extended period of time.

122.    The medical records do not indicate reasoning for the failure of providers at the Portland VAMC to have completed a work-up on Mr. Smith for a bone marrow transplant.

123.    At this point in time, Mr. Smith began receiving the majority of his medical care at OHSU and other private providers.

124.    Mr. Smith's condition deteriorated rapidly, before a transplant evaluation could be completed.

125.    Mr. Smith died on August 8, 2015.

## Negligence/Wrongful Death

126.    Mrs. Smith re-alleges and restates paragraphs 1 through 125 as if fully stated herein.

127.    At all times relevant to this action, the agents, servants, employees, and personnel of the Defendant United States of America were acting within the course and scope of their employment in providing medical care and treatment to Mr. Smith, a veteran of the United States Armed Forces entitled to such care and treatment.

128.    Throughout the course of his treatment at the Portland VAMC, healthcare providers caring for Mr. Smith had a duty to provide him with medical care and treatment consistent with the governing standards of medical care.

129.    Healthcare providers at the Portland VAMC, including, but not limited to, Drs. Fleischman and Azar, owed Mr. Smith a duty to properly diagnose and treat his MDS.

130.    Healthcare providers at the Portland VAMC, including, but not limited to, Drs. Fleischman and Azar, owed Mr. Smith a duty to timely complete a work-up for a stem cell transplant.

131.    Healthcare providers at the Portland VAMC, including, but not limited to, Drs. Fleischman and Azar, deviated from appropriate standards of medical care in their treatment of Mr. Smith on multiple occasions, resulting in Mr. Smith's death. Healthcare providers breached the standard of care in the following respects:

    a.  Failure to appropriately diagnose and treat Mr. Smith in a timely fashion for his MDS;

    b.  Failure to appreciate the significance of Mr. Smith's laboratory tests and clinical presentation;

    c.  Delay in providing Mr. Smith with an appropriate diagnosis;

d.  Failure to counsel Mr. Smith regarding appropriate options for treating MDS;

e.  Failure to provide to Mr. Smith any care or treatment that could have extended his life;

f.  Failure to refer Mr. Smith for a stem cell transplant at an appropriate time;

g.  Failure to refer Mr. Smith to meet with providers at the Seattle VAMC for a stem cell transplant work-up;

h.  Failure to perform a stem cell transplant on Mr. Smith;

i.  Failure to timely perform HLA typing;

j.  Failure to administer growth factor support, antibiotic prophylaxis or timely treatment with azacytidine;

k.  Failure to assess Mr. Smith as an appropriate candidate for a stem cell transplant despite his completion of a psychological examination that found he was qualified for the procedure;

l.  Failure to advise Mr. Smith at any point in time that he was no longer being considered for a stem cell transplant; and

m.  Committing other negligent acts and/or omissions in violation of the applicable standards of medical care that may be revealed through additional factual investigation, expert review, and/or discovery.

132.  As a result of the breaches of the standard of care on the part of Portland VAMC healthcare providers, Mr. Smith became progressively ill.

133.    As a direct and proximate result of the aforementioned negligence of the agents, servants, and/or employees of the United States at the Portland VAMCs, Mr. Smith died on August 8, 2015.

134.    As a direct and proximate result of the aforementioned negligence of the agents, servants, and/or employees of the United States at the Portland VAMCs, Mr. Smith was caused to suffer physical injury, pain, mental anguish, inconvenience and physical disability prior to his death.

135.    As a direct and proximate result of the aforementioned negligence of the agents, servants, and/or employees of the United States at the Portland VAMCs, Mr. Smith suffered the following injuries:

     a.    Progression of his disease with no treatment;

     b.    Pain and suffering in the final years of his life; and

     c.    Death.

136.    As the legal spouse of Mr. Smith – both at the time agents, servants, and/or employees of the United States breached the standard of care and at the time of his death – Mrs. Smith maintains a claim to recover compensation for her loss of consortium and other injuries.

137.    As a direct and proximate result of the aforementioned negligence of the agents, servants, and/or employees of the United States at the Portland VAMCs in their treatment and the death of Mr. Smith, Mrs. Smith has suffered various damages. Accordingly, Mrs. Smith claims the following injuries:

   a.   Loss of Mr. Smith's society;

   b.   Loss of Mr. Smith's companionship;

   c.   Loss of Mr. Smith's comfort;

   d.   Loss of Mr. Smith's love;

   e.   Loss of Mr. Smith's solace;

   f.   The value of the lost household and domestic services previously performed by Mr. Smith;

   g.   Economic loss resulting from the injury and death of Mr. Smith; and

   h.   Any other pecuniary and non-pecuniary loss proximately resulting from Mr. Smith's death.

138.   Accordingly, Mrs. Smith claims the following damages:

   a.   Compensation for the physical injury and disability suffered by Mr. Smith;

   b.   Compensation for the extreme pain, suffering, and mental anguish of Mr. Smith;

   c.   Compensation for Mr. Smith's loss of enjoyment of life during his final years of life;

   d.   Compensation for past medical expenses;

   e.   Compensation for Mrs. Smith's loss of consortium and damages listed in Paragraph 137, parts "a" through "h";

   f.   Compensation for economic losses sustained as a result of Mr. Smith's death; and

g.  Compensation for any other damages sustained by Mr. Smith or Mrs. Smith as a proximate result of the Defendant's negligent acts.

139.    For these damages, Mrs. Smith demands $6,000,000.00 (Six Million and 00/100 Dollars) in compensation.

WHEREFORE, Mrs. Smith respectfully requests that this Court grant judgment in her favor against Defendant as prayed for above and award her such other further relief as is just and equitable under the circumstances.

Respectfully Submitted,

DEBORAH J. SMITH, Individually
and as Administrator of the
ESTATE of STEPHEN M. SMITH

By: _____
Laura B. Kalur, OSB No. 023424
Kalur Law Office, P.C.
11575 SW Pacific Hwy., Suite 142
Tigard, OR 97223
(971) 727-3959
(971) 727-3942 – Facsimile
lkalur@kalurlaw.com